Filed 9/26/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | A163112 |
| v. | |
| FRANKLIN BINGHAM, | (Alameda County |
| Defendant and Appellant. | Super. Ct. No. 20-CR-012435) |

The erroneous exclusion of impeachment evidence, pursuant to Evidence Code section 1202, of a key declarant does not require reversal unless the error caused a miscarriage of justice. The impact of the erroneously excluded evidence must be examined based on the entire record presented at trial.

Defendant appeals from a judgment convicting him of infliction of corporal injury on a romantic partner (Pen. Code, § 273.5, subd. (a)).[1] The victim did not testify at trial, but her 911 call was admitted into evidence. Defendant contends that the trial court committed reversible error by excluding the victim's prior convictions and inconsistent statements made after her 911 call, which defendant offered for impeachment. He also contends his case should be remanded for resentencing based upon recent changes in the law. We find that the trial court erred in excluding the

---

[1] All statutory references are to the Penal Code unless otherwise stated.

1

impeachment evidence. However, we affirm the conviction because the error was harmless. We agree with the parties that the matter should be remanded for resentencing.

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendant was charged by an amended information with one count of corporal injury to relationship partner (§§ 273.5, subd. (a), 243) and one count of second degree robbery (§ 211). The amended information alleged that defendant inflicted corporal injury on the victim and, by means of force and fear, took personal property from her. It also alleged that defendant had suffered two prior convictions for residential burglary, that both of the convictions were prior serious felonies, and that one of the two convictions was a strike offense. (§§ 459, 667, subds. (a)(1) & (e)(1), 1170.12, subd. (c)(1).)

**I.** *Motion in Limine Evidentiary Rulings*

At the motion in limine hearing on December 16, 2020, the People sought to introduce the victim's 911 call at trial. They argued it was admissible as an excited utterance under Evidence Code section 1240.[2] The People also sought to exclude subsequent statements the victim made to the deputy district attorney recanting statements she made in the 911 call. They argued these statements were hearsay that did not fall under any applicable hearsay exception. The People also moved to exclude impeachment of the victim with her criminal history because it was remote in time and not relevant. The People's motion stated that the victim's most recent conviction was in 2013 for misdemeanor misuse of personal identifying information

---

[2] Evidence Code section 1240 states: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

(Pen. Code, § 530.5). She also had a 2009 conviction for forgery by passing a forged check (*id.*, § 470, subd. (d)) and a 2007 conviction for burglary (*id.*, § 459).

Defendant opposed the People's motion to admit the 911 call, arguing it was hearsay, among other claims. Defendant also filed a motion in limine seeking to admit the victim's statements to the deputy district attorney recanting the statements she made in the 911 call.[3] He argued the victim's statements were admissible under Evidence Code sections 770 and 1235, as inconsistent statements.[4] He also moved to admit the victim's 2009 and 2013 prior convictions, as well as an additional 2010 felony conviction for burglary.

---

[3] Defendant filed a series of emails between the victim and the deputy district attorney from October 13, 2020, to October 20, 2020. In emails dated October 16, 2020, the victim wrote that she did not want to help with the case against defendant; she loved him; and she did not want him in prison, but she thought he should "get some type of help like a program or meetings." In an October 20, 2020 email, the victim again stated she would not help with the case and that defendant did not assault her and should not be in jail. In a second email of the same date, the victim stated, "I was very mad and angry with him that night and I wanted to get back at him so I injured myself and told the police that he did it to me."

[4] Evidence Code section 1235 states: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with section 770."

Evidence Code section 770 states: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

3

At the hearing on the motions in limine, the trial court found the 911 call admissible under Evidence Code section 1240.[5]  Defense counsel argued the victim's subsequent inconsistent statements were admissible under the hearsay exception for inconsistent statements in Evidence Code section 1235. The trial court found the victim's inconsistent statements were inadmissible hearsay that did not fall within any hearsay exceptions unless the victim testified.  The trial court further concluded that the victim's 2010 and 2013 convictions were admissible for impeachment if the victim testified at trial.

On January 4, 2021, defense counsel filed a motion for reconsideration of the trial court's rulings to exclude the victim's inconsistent statements and prior convictions.  The motion argued that the evidence was admissible for impeachment under Evidence Code section 1202, which states:  "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain to deny such inconsistent statement or other conduct.  Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing."  The trial court declined to reconsider its prior ruling because it would give the defendant "a second bite at the apple."  The trial court explained that defense counsel had the opportunity the first time to explain any applicable Evidence Code sections.

---

[5] The trial court proposed redacting certain portions of the call regarding the ownership of the car, which did not involve the victim's immediate injuries.  However, the defendant asked to be permitted to play additional portions of the 911 call, and the People agreed.  It appears from the record that the 911 call was played in its entirety at trial.

4

On January 7, 2021, in the middle of the trial, the victim sent an email to the deputy district attorney attaching a notarized affidavit stating: "I am declaring that Franklin Bingham did not assault me on September 19th, 2020. Franklin Bingham also did not burglarize anything of mine." The defendant moved to admit the affidavit as impeachment evidence under Evidence Code section 1202. The trial court ruled that the affidavit was inadmissible hearsay to which no exception applied.

## II. *Trial Testimony*

On September 20, 2020, Nader N. was working as a night manager at a hotel in Fremont. At 12:06 a.m., Nader saw Tracy L. come down to the hotel lobby. She was "terrified, she was scared, she was shaking and her face was full of blood." She asked Nader to call 911. Nader recalled that five minutes before Tracy came down to the lobby, he saw a man exit the elevator and leave through the hotel's back door. Nader testified that the man seemed angry and that he pushed the door open very hard. Nader did not see the man's face because he was wearing a mask and looking away from Nader.

Nader gave Tracy a towel for her face because "blood was everywhere." Nader called 911 and then gave the phone to Tracy. While Tracy was on the phone with 911, Nader went outside with a hotel security guard to see if the man who recently exited the hotel was in the parking lot. They did not find him. When the police arrived, Nader took them to Tracy's hotel room. The room was "messed up" with blood on the sheets and the towels. Nader told the police that the night before the incident he saw Tracy with her boyfriend, whom Nader described as "cold like ice." The man whom Nader saw exit the hotel just prior to when the injured Tracy came to the hotel lobby had the same body shape and size as the person he saw with Tracy the previous night.

The prosecution played a recording of Tracy's 911 call. Tracy stated, "[M]y boyfriend beat me up and I need an ambulance." She gave defendant's name and provided a physical description. She said he left the hotel in a black Dodge Avenger. Tracy explained, "[M]y boyfriend came into my room, so that we could talk, and we uh, we got into an argument, and he had a lock in his hand and he started punching me. He started, he started, he tried to kill me. My face is, my whole side of my face is swollen. I, he punched my back, he punched my stomach." She also said that defendant stole her car, her phone and some rings. When the 911 operator asked Tracy if anyone had been drinking or using drugs, Tracy said that she did not know if defendant had, but that she had not.

Police officer Jacob Crow responded to the 911 call and found Tracy in the hotel lobby. Tracy "had blood coming from her face and was holding a towel to her head." She "appeared scared and frightened." She had cuts, bruising and swelling to her right eye and a burn mark on her left cheek. Officer Crow interviewed Tracy for about 20 to 30 minutes before she was taken to the hospital. She was coherent and did not appear to be under the influence of any illicit substance. Officer Crow went to Tracy's hotel room with Nader and saw a bed pillow covered in blood and several towels "soaked in blood." Officer Crow attempted to obtain video surveillance footage from the hotel, but the hotel manager emailed him that the servers were down due to wildfires. He never obtained surveillance video.

Officer Crow broadcast defendant's description to other police officers. The next day, defendant was arrested when he was found next to the Dodge Avenger. Officer Crow booked defendant into jail. He searched defendant and the car. Officer Crow found two women's rings in defendant's pants pocket. In the car, he found a heavy black metal padlock and several phones.

6

Officer Nicholas Forsberg brought Tracy to the location where the car was recovered. Tracy identified the rings as hers. When Officer Forsberg showed Tracy the metal lock, her eyes welled up and she began to cry. He also observed that Tracy's right eye was swollen and had been sutured and bandaged. The police released the car and its contents to Tracy.

Phone records from the jail showed 246 calls between defendant and Tracy from September 21, 2020, to January 5, 2021, the day the trial began. In addition, there were 14 recorded jail video calls between defendant and Tracy between October and December 2020. During one of the video visits, Tracy showed defendant her body parts in a sexually suggestive manner.

On a September 25, 2020 recorded call between defendant and Tracy, defendant said, "You know I'm sorry right." Tracy responded, "Um, you know I, I wish li [*sic*] sounded like you were," and then defendant said, "Now you know I am, look, Tracy. When everything happened, when did I stop?" Tracy said, "When you saw all the blood." Defendant then said, "None of that shit happened," and Tracy replied, "[W]hat what what what." He then said, "Nah I'm not saying shit over the phone like this. Look, Tracy," and, "You know how I love you, you know I love you you know fuckin what you mean to me you know everything tracy so what are we doing here tracy." (*Sic*.)

During a November 6, 2020, recorded video visit, defendant said to Tracy, "Cause regardless of anything that ever happened between us, any ever single time right, you chose to talk to the cops still. We could have walked away from each other at anytime Tracy. We could have, you could have gone back to Arizona anytime you wanted to. You could have asked me for money to go back. I would have given it to you. You could have don't anything, you could have had the money to go back or never seen me again. But you've always chose to come back to be with me or I've always taken you

7

back no matter what's happened.  No matter what.  With every little secret, with every little lie, with every little bullshit with whatever the fuck you got going on in your life, I've always chosen you.  But I never would have ever put you in this situation, ever.  I . . . definitely (unintelligible). . . ." (*Sic.*)  Tracy said, "I would have never fuckin done what you did."  Defendant responded, "Nah but what you do it like hella worse and shit man.  You hurt me all the time so bad Tracy."

The defense called the assistant manager of the hotel, who testified that she was not on duty the night of the incident but was given contact information for Officer Crow and learned that he requested video surveillance footage.  She testified that she emailed Officer Crow but he did not respond.  She also explained that because the servers were down due to wildfires, it was not possible to download and supply copies of footage at the time.  However, an off-site company handled the surveillance system, and it was possible to view and play back footage.  The video footage would have remained available for 90 days, until December 20, 2020.

Defendant testified that he had been in an on-again, off-again relationship with Tracy for 11 years.  He first went to the hotel to meet Tracy on the morning of September 19, 2020.  He took Tracy to run some errands and then brought her back to the hotel.  He drove the Dodge Avenger, which he stated was his car.  Tracy asked defendant if he knew anyone who wanted to buy some rings, and she texted defendant, asking him to come back to the hotel. Defendant returned to the hotel about 8:30 p.m. that night.  When he arrived, Tracy was not there, and he waited for her for about 20 minutes.

When Tracy returned to the hotel, she asked defendant to come up to her room.  Defendant bought the rings from Tracy.  Tracy needed money to go to Arizona.  Earlier in the day, Tracy tried to talk to defendant about getting

8

back together, and he told her it was over for sure but he still cared about her and wanted to help her go back to Arizona.

Defendant started to fall asleep, and Tracy offered him methamphetamine. They each took a hit. Defendant lay on the bed and was starting to fall asleep, and then Tracy lay on top of him and tried to kiss his cheek. He woke up and told Tracy to get up. She continued to try to kiss him, and he tried to push her off his chest because he was having trouble breathing. She would not move, so defendant picked up his legs and "bucked her up . . . ." Tracy flew forward and "hit the head board [*sic*] a little bit . . . ." After about a minute, defendant looked at Tracy and saw she was bleeding on her right cheek. He got her a towel. She yelled at defendant and told him to leave. Defendant got his things and left. It was about 10:00 p.m. when he left. Defendant said he did not intend to hurt Tracy and that he did not steal her phone or her jewelry.

Defendant testified that Tracy gave him the car and that everything in the car, including the metal lock, was his. He acknowledged that since his arrest he had numerous phone calls and video visits with Tracy and that they continued to talk at night during the trial. They made up, and defendant acknowledged that they tell each other "I love you" when they talk. Defendant admitted that he apologized to Tracy in the September 25, 2020 phone call but explained that he was referring to yelling at Tracy. When he asked Tracy, "When everything happened, when did I stop?" he meant when did he stop yelling at Tracy. When, during the November 6, 2020 video visit, Tracy said she would never do what he did, defendant understood her to be referring to when he "bucked her off" and yelled. When defendant said Tracy did worse to him, he was referring to Tracy's taking funds from their joint checking account, which they were saving for an apartment. Defendant

9

explained that he was mad at Tracy for talking to the police because she made false allegations.

When defendant was interviewed by Officer Crow after his arrest, he denied assaulting or hitting Tracy. Defendant told Officer Crow that Tracy had a bruise under her right eye and under her cheek before defendant arrived at the hotel. He did not tell Officer Crow that he "bucked" Tracy off him, and Officer Crow did not explain Tracy's injuries. The prosecution played a portion of defendant's recorded interview with Officer Crow. Defendant admitted he heard himself tell Officer Crow in his recorded interview that he had no idea how Tracy was injured. Defendant also acknowledged that if he told Officer Crow that he did not know why there was blood in the hotel room, "then [he] might have been less than truthful with the cop."

Defendant admitted into evidence hospital records from the date of the incident, in which Tracy acknowledged use of methamphetamine, and records from the Department of Motor Vehicles. Although the department's records do not appear to be part of the appellate record, defense counsel argued in closing argument that the records stated Tracy was not the owner of the Dodge Avenger.

## III. *Verdict*

The jury found defendant guilty of infliction of corporal injury on a relationship partner (§ 273.5, subd. (a); first count) and not guilty of second degree robbery (§ 211; second count). After a bifurcated court trial, the trial court found that defendant suffered a prior strike conviction based on his June 7, 2013 prior conviction for first degree burglary.[6] On July 8, 2021, the

---

[6] The People dismissed the second prior conviction allegation.

10

trial court sentenced defendant to the upper term of four years, doubled due to the prior strike, for a total sentence of eight years.

## DISCUSSION

### I.   *Exclusion of Impeachment Evidence*

Defendant argues the trial court abused its discretion when it excluded evidence of Tracy's statements to the prosecution recanting her claims made in her 911 call and evidence of Tracy's prior convictions. He argues the evidence was admissible under Evidence Code section 1202.

The People concede that the trial court erred by not admitting the impeachment evidence. We agree with the parties. The trial court appeared to believe that the offered impeachment evidence was not admissible unless Tracy testified. However, "under [Evidence Code] section 1202, when a hearsay statement by a declarant who is not a witness is admitted into evidence by the prosecution, an inconsistent hearsay statement by the same person offered by the defense is admissible to attack the declarant's credibility." (*People v. Corella* (2004) 122 Cal.App.4th 461, 470 (*Corella*).) Here, the trial court admitted the 911 call containing Tracy's statements. Under Evidence Code section 1202, Tracy's subsequent inconsistent statements and her prior convictions were admissible for impeachment.

However, the erroneous exclusion of evidence does not require reversal unless the error caused a miscarriage of justice. (Evid. Code, § 354.) The applicable prejudice test is whether there is a "reasonable probability defendant would have obtained a more favorable result had [the impeachment evidence] been admitted." (*People v. Brooks* (2017) 3 Cal.5th 1, 47–48, 52 (*Brooks*) [applying prejudice standard of *People v. Watson* (1956) 46

11

Cal.2d 818, 836 (*Watson*), to erroneous exclusion of evidence under Evid. Code, § 1202].)[7]

Defendant cites *Corella*, which found prejudicial error in a case where the defendant was convicted of corporal injury to a spouse after the trial court admitted statements defendant's wife made to a 911 operator, the police, and medical personnel that defendant hit her, but excluded the wife's subsequent statement during the preliminary hearing recanting her prior statements. (*Corella, supra*, 122 Cal.App.4th at pp. 464, 472.) *Corella*'s prejudice discussion begins by noting that juries are to determine witness credibility and then explains: "Unquestionably, Mrs. Corella's credibility was the pivotal factor in this case, but because she was neither seen nor heard at trial, the jury did not have the opportunity to gauge her credibility through an assessment of her demeanor and manner of testifying, the detail of the description of the events at issue, and the overall quality of her testimony. [Citations.] The inconsistent hearsay statement by Mrs. Corella at the preliminary hearing provided a critical alternative method for the jury to determine her credibility in the absence of her presence as a live witness at trial. The trial court's exclusion of the inconsistent statement was prejudicial because it prevented the jury from making a credibility decision based on all

---

[7] Defendant concedes that evidentiary errors are generally considered under the "reasonable probability" prejudice test of *Watson*, but he suggests that the stricter "beyond a reasonable doubt" prejudice standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), should apply because the evidentiary error prevented defendant from presenting his theory of the case to the jury. We disagree that the exclusion of evidence at issue here rises to the level of constitutional error requiring application of the *Chapman* standard. (*Brooks, supra*, 3 Cal.5th at pp. 47–48, 52.) Nor do we agree that the erroneous evidentiary rulings prevented defendant from presenting his theory of the case to the jury. Defendant presented his theory of the case through his own testimony.

available evidence." (*Id.* at p. 472.) The *Corella* court then concluded that there was prejudice under both the "reasonable probability" standard of *Watson, supra*, 46 Cal.2d at page 836, and the stricter "beyond a reasonable doubt" standard of *Chapman, supra*, 386 U.S. at page 24. (*Corella*, at p. 472.)

There are factual similarities between *Corella* and this case. However, we question *Corella*'s prejudice analysis. On review of claims asserting the erroneous exclusion of evidence, reversal is only required where the error caused a miscarriage of justice. (*People v. Richardson* (2008) 43 Cal.4th 959, 1001, superseded by statute on another ground as stated in *People v. Nieves* (2021) 11 Cal.5th 404, 509.) "[A] 'miscarriage of justice' should be declared only when the court 'after examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra*, 46 Cal.2d at p. 836.) *Corella*'s conclusion that there was prejudice because the jury was prevented from "making a credibility determination based on all available evidence" does not appear to consider the entire record. (*Corella, supra*, 122 Cal.App.4th at p. 472.) To the extent it suggests that the erroneous exclusion of impeachment evidence against a key declarant offered under Evidence Code section 1202 is necessarily prejudicial, we decline to follow *Corella*'s prejudice analysis. Instead, we consider the impact of the evidentiary error in light of the entirety of the evidence presented at trial. (*Brooks, supra*, 3 Cal.5th at pp. 52–53 [finding no prejudice due to erroneous exclusion of impeachment evidence under Evid. Code, § 1202, after examining other evidence presented to jury].)

We find that even if Tracy's statements recanting what she said in the 911 call and her prior convictions were admitted, it is not reasonably

13

probable that defendant would have obtained a more favorable outcome. The jury heard Tracy's statements on the 911 call explaining how defendant hit her using a heavy metal lock. They also heard testimony from Nader who saw Tracy injured and in distress when she came down to the hotel lobby. Nader testified that he saw a man, who seemed angry, leaving the hotel five minutes before Tracy came to the lobby. The man had the same body shape and size as the person he saw Tracy with the previous night. Officer Crow also described Tracy's injuries and his observations of her emotional state when he responded to the scene. Photographs of Tracy's injuries were admitted into evidence. A heavy metal padlock was discovered in defendant's car and he admitted it was his. Multiple bloody towels were found in the hotel room. Defendant admitted he was in Tracy's hotel room the night of the incident. Further, the jury heard a recorded phone call five days after the incident in which the defendant apologized to Tracy and asked, "[W]hen did I stop?" and she responded, "When you saw all the blood." Defendant testified that he and Tracy had reconciled and were in frequent contact while defendant was in jail. The jury also heard a portion of defendant's recorded interview with the police in which defendant said he had no idea how Tracy was injured. Defendant then acknowledged in his testimony that he was "less than truthful with the cop" when he told the police he did not know why there was blood in the hotel room.

Finally, defense counsel impeached Tracy's credibility through the admission of records from the hospital stating that Tracy admitted methamphetamine use, which was inconsistent with her statement in the 911 call that she did not consume drugs the night of the incident. Defendant also admitted records from the Department of Motor Vehicles showing that the Dodge Avenger was not registered to her. Defense counsel argued during

14

closing argument that Tracy's statements to the 911 operator that she owned the car were not true.

There was strong evidence of defendant's guilt, and the jury received other impeachment evidence. We find that based on the entire record it is not reasonably probable that the jury would have acquitted defendant if it had learned of Tracy's prior convictions and that she recanted what she said on the 911 call after defendant was arrested and had apologized to her.

## II. *Remand for Resentencing and Vacation of Probation Investigation Fee*

Defendant contends he is entitled to resentencing under amended section 1170, subdivision (b), which limits the trial court's ability to impose an upper term sentence. (§ 1170, subd. (b), amended by Stats. 2021, ch. 731, § 1.3.) The People agree that the amended law applies retroactively to defendant's case and that we should remand for resentencing. We agree with the parties that amended section 1170 applies retroactively to defendant's case. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039 [amendments to § 1170 are "an ameliorative change in the law applicable to all nonfinal convictions on appeal"].)

Defendant further contends that at his sentencing on July 8, 2021, the trial court imposed a $250 probation investigation fee under former section 1203.1b, which was repealed as of July 1, 2021. (Assem. Bill No. 1869 (2019–2020 Reg. Sess.) § 62; former § 1465.9, subd. (a) ["On and after July 1, 2021, the balance of any court-imposed costs pursuant to Section . . . 1203.1b . . . , as those sections read on June 30, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated"].) The People agree that the $250 probation investigation fee should be vacated. We agree with the parties and direct the trial court to vacate the $250 probation investigation fee on remand.

15

## DISPOSITION

Defendant's conviction is affirmed.  The case is remanded for resentencing under Penal Code section 1170 as amended, and the trial court is directed to vacate the $250 probation investigation fee.  The trial court shall forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

 

_____

Jackson, P. J.

WE CONCUR:

_____

Burns, J.

_____

Chou, J.

A163122/*People v. Franklin Bingham*

A163122/People v. Franklin Bingham

Trial Court:          Superior Court of the County of Alameda

Trial Judge:          Kimberly Colwell

Counsel:              Tonja R. Torres, under appointment by the Court of
                          Appeal, for Defendant and Appellant.

                      Rob Bonta, Attorney General, Lance E. Winters and
                          Jeffrey M. Laurence, Assistant Attorneys General,
                          Eric D. Share and Alisha M. Carlile, Deputy
                          Attorneys General, for Plaintiff and Respondent.